STATE of Tennessee, Appellee,

v.

Larry KELLEY, Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

Aug. 11, 1993.

Randy G. Rogers, Athens, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Jeannie Kaess, Asst. Atty. Gen., Nashville, and Wayne Carter, Asst. Dist. Atty. Gen., Tenth Judicial Dist., Cleveland, for the State.

## OPINION

WADE, Judge.

The defendant, Larry Kelley, was convicted of first degree murder and sentenced to a term of life imprisonment. In this appeal, he alleges first that the evidence was insufficient to establish that he had the mental capacity to commit a first degree murder; and, secondly, that the trial court erroneously limited the use of a medical report for identification purposes only.

We find no error and affirm the judgment of the trial court.

The victim, Brenda Kelley, was divorced from the defendant on May 17, 1990. The marriage had lasted 2½ years. Afterwards, the defendant and the victim twice attempted a reconciliation but failed. In November of 1990, the victim established a separate residence.

By this time, the victim had sought and received from the courts an order of protection from the defendant. On December 2, however, the victim reported to the police that on the day before, the defendant had confronted her at a laundromat, choked her, and threatened to kill her. In fact, the defendant admitted to the victim's daughter, who along with the victim's son had continued to reside in the defendant's home, that he had committed the assault and apologized for the incident.

At about 9:00 P.M. that evening, the defendant shot and killed the victim while parked just outside the Church of the Harvest in Cleveland. Witnesses heard screams and saw the defendant struggle with the victim as she tried to get out the passenger door of his automobile. The defendant fired four or five shots then climbed out of the car and pushed the victim to the ground. A gun was found in the seat of the vehicle. When approached by the pastor and members of the church who had witnessed the incident, the defendant appeared distraught and exclaimed, "Oh, my God," and "What have I done?"

Police identified the weapon as a Colt .380 semi-automatic handgun. The clip held five bullets. Empty shells, found inside the vehicle, indicated the bullets were hollow point, designed to cause maximum damage. Another weapon was found hidden in a tissue box in the victim's vehicle. In their search of the defendant's car, officers found an ammunition belt for the bullets.

Medical testimony established that the victim bled to death from five gunshot wounds to the back. Her face was swollen and discolored from an apparent beating. There was evidence of a bloody nose.

The defendant was evaluated at the Middle Tennessee Mental Health Institute in May of 1991. A medical team determined that the defendant had a mental illness, "an adjustment disorder with depressed mood." The report indicated that the defendant did not exhibit disillusional thinking or grossly false belief. There was some indication that the defendant experienced visual hallucinations, had delusionary religious guilt, and heard voices. The defendant was classified as having a dependent and avoided personality, a type of mental illness.

James Flowers, the defendant's business partner in the heat and air-conditioning business, testified for the defense. He described the defendant's behavior just before the shooting as disoriented and preoccupied. Friends, family and associates of the defendant testified that "something was wrong" with the defendant during the Thanksgiving holidays; he appeared depressed and nervous. One witness said the defendant looked "like a zombie."

Bruce Lee, Jr., a physician who treated the defendant two days before the shooting, tes-

tified that the defendant had acute anxiety and acute reactive depression. He prescribed sleeping pills and anti-depressants then called the defendant's mother and suggested that she take away his guns and ammunition.

Dr. Jackson White testified on rebuttal for the state. He determined that the defendant had a stress-related depression at the time of the shooting but knew the difference between right and wrong and had control over his behavior. Dr. Samuel Craddock concluded that the defendant was competent to stand trial, was committable to a psychiatric facility because of a mental illness, but was able to appreciate the wrongfulness of his act at the time of this offense. Dr. Craddock conceded that the defendant's depression affected his ability to inhibit his impulses but held to his opinion that the defendant did not qualify for an insanity defense.

Dr. Kenneth Anchor, an associate professor of psychology at Vanderbilt, examined the defendant in March of 1991. He concluded that the defendant suffered from "a severe major depressive episode with psychotic features." He testified that the defendant was insane at the time of the shooting. That is, the defendant, in his opinion, did not have the ability to distinguish right from wrong and, because of his illness, could not conform his acts even if he had known the difference. Dr. Anchor explained that just because the defendant asked forgiveness immediately after the shooting did not indicate that he understood the wrongfulness of his act.

I

The defendant initially argues that because all of the health care professionals concluded that the defendant was suffering from a mental illness at the time of the offense, that this illness precluded him from formulating the requisite mental intent to commit either a first degree murder, a second degree murder, or a voluntary manslaughter. The defendant concedes, however, that the jury instructions [1] were generally favorable; the trial court permitted the jury to consider the nature of the defendant's illness as it pertained to the issue of intent:

I'm just telling [the jury] that they can take into consideration the evidence ... that they've heard in determining whether the defendant's act was intentional.... [I]f the jury were to determine that his mental condition was such that his acts were not intentional ... then that eliminates first [and] second degree murder and voluntary manslaughter.

The record indicates that the trial court charged the jury that intent on the part of the defendant was a requisite element for first degree murder, second degree murder, and voluntary manslaughter. Without objection, the trial court charged that the jury might consider the evidence about the defendant's mental capacity in determining whether the acts were premeditated or intentional. These instructions were given in addition to those provided on the defense of insanity. The record establishes that the trial court also charged involuntary manslaughter, a crime that does not necessarily require a finding of intent. The court declined to instruct the jury on criminally negligent homicide.

■ Initially, the law presumes the sanity of an accused. *Brooks v. State*, 489 S.W.2d 70, 72 (Tenn.Crim.App.1972). If any evidence introduced during the course of the trial creates a reasonable doubt on the issue, the burden shifts to the state to establish the defendant's sanity beyond a reasonable doubt. *Graham v. State*, 547 S.W.2d 531, 544 (Tenn.1977). Under these circumstances, sanity becomes an essential element of the crime. *State v. Clayton*, 656 S.W.2d 344, 345–46 (Tenn.1983). In order to convict, the state must prove "(1) that at the time of the offense the defendant was not suffering from a mental disease or defect, *or* (2) if he was, that his illness was not such as to prevent him from knowing the wrongfulness of his conduct *and* from conforming his conduct to the requirements of the law." *State v. Green*, 643 S.W.2d 902, 912 (Tenn.Crim. App.1982) (emphasis in original). Although there was medical testimony to refute the evidence of insanity presented by the defendant here, the jury is not required to accept

1. The actual instructions given do not appear in    the record.

the testimony of a psychiatrist or a psychologist on the sanity issue to the exclusion of lay testimony or other evidence inconsistent with the defendant's sanity. *Edwards v. State,* 540 S.W.2d 641, 646–47 (Tenn.1976).

In several previous cases, this court has held that a defense of diminished capacity, something short of insanity, is not recognized in Tennessee. *See State v. Taylor,* 645 S.W.2d 759, 763 (Tenn.Crim.App.1982); *State v. Croscup,* 604 S.W.2d 69, 72 (Tenn.Crim. App.1980). Recently, however, an opinion of this court questioned the accuracy of those cases:

> Given Tennessee precedent, this blanket statement is subject to dispute. Unquestionably, the defense of voluntary intoxication relies upon . . . a diminished capacity. Also, the holding in *Davis [v. State],* 161 Tenn. 23, 28 S.W.2d 993 (1930) ], indicated an acceptance of the proposition that an abnormal mental condition short of insanity, as then defined, could be used to negate the state of mind elements . . . required for first or second degree murder.

*State v. Robert Earl Shelton,* 854 S.W.2d 116 (Tenn.Crim.App.1992); APTA denied March 22, 1993.

■■■ The holding in *Shelton* suggests that the trial court in this instance had properly fashioned a diminished capacity defense instruction as it related to the intent of the defendant to commit the crime. *See State v. Taylor,* 771 S.W.2d 387, 397 (Tenn.1989). The instruction offered the jury the opportunity to determine whether the mental illness rendered the defendant incapable of an intentional killing. While the defendant admits the favorability of the charge, at least in contrast to the several prior, reported cases, the jury nonetheless rejected the claims of both insanity and diminished capacity and concluded that the defendant was fully capable of forming the intent to commit murder in the first degree. That was their prerogative. In our view, the evidence was sufficient to support the theory of the state. *State v. Herbert William Etheredge,* No. 1046, 1988 WL 33862 (Tenn.Crim.App., Knoxville, April 11, 1988).

■■■ On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978). The relevant question for this court is whether, after reviewing the evidence in that light, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2782, 61 L.Ed.2d 560 (1979); Tenn.R.App.P. 13(e).

Here, the defendant threatened to kill the victim the day before the shooting. On the following day, he waited for her with a .380 semi-automatic handgun in the church parking lot. The gun contained hollow point bullets designed to inflict maximum damage. There were five shots to the back. This is strong circumstantial evidence on the issue of intent. While *Shelton* was decided prior to the Criminal Sentencing Reform Act of 1989 and while the new act does not provide that a mental illness, short of insanity, can be used as a defense, the mental state of the defendant is nonetheless relevant to a charge of first degree murder. *See* Tenn.Code Ann. § 39–11–501. In *State v. Brown,* 836 S.W.2d 530, 537 (Tenn.1992), for example, the Supreme Court considered the mental illness of the defendant, who suffered from a depression with psychotic features, in modifying a first degree murder conviction to murder in the second degree.

Despite the mental illness of the defendant in this instance, however, we think that the proof was sufficient to establish that the defendant acted with premeditation and deliberation in firing the fatal shots. In our judgment, the jury had a sufficient evidentiary basis to so find.

### II

■■■ Next, the defendant contends that the trial court committed error by refusing to admit into evidence a document upon which the defense witness, Dr. Anchor, relied in his determination that the defendant was insane at the time of the offense. Two days after his arrest, the defendant was examined by a physician who diagnosed a mental illness and

recommended hospitalization. His report provided as follows:

> Larry Kelley is a 43–yr old WM brought in from jail for being depressed and suicidal. PT apparently had an argument [with] his wife past Sunday and I believe the PT's gun went off in the scuffle and his wife was killed according to patient.

Dr. Anchor testified that he considered the document pertinent to his own diagnosis.

Both the defendant and the state agree that Rule 703 of the Tennessee Rules of Evidence applies:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.

The defendant suggests that the rule authorizes the expert witness to admit a document upon which his diagnosis is based—even if the document was otherwise inadmissible. We disagree. The exchange of questioning prior to the submission of the document was as follows:

> Q. Doctor, let me show you this document, which is dated 4 December 90, and ask you if this is the kind of thing you normally consider and if you did in fact in arriving at your final diagnosis glean some information from that document?
>
> A. Yes, I believe I had the opportunity to review this, along with a number of other documents.
>
> Q. And can you tell us what that document is?
>
> A. Yes, this appears to have been filled out by a physician that saw Mr. Kelley during a time of distress, and it was determined by that physician that he was mentally ill and did need treatment, was a risk to himself and clearly was psychologically maladjusted.

> Q. And is the date of that doctor's assessment and that history important to you?
>
> A. Yes.
>
> Q. What was the date of that?
>
> A. December 4, 1990.
>
> Q. Is that a part of the history you rely upon to give your diagnosis ...?
>
> A. Yes, I was made aware of this psychiatric evaluation.

Rule 703 does not authorize the admission of documents which are otherwise inadmissible. One treatise suggests that if the document is not admissible under the evidentiary rules on hearsay grounds, the jury should be instructed as to its appropriate use, i.e., "solely to understand and assess the expert's testimony." *Tennessee Law of Evidence*, Cohen, Paine, and Sheppeard, § 703.4, pp. 363–364.

There is little argument about the admissibility of the evidence. In fact, defense counsel commented on the exhibit, "if there's a problem with it, that's fine." Moreover, the essence of the document was actually testified to by Dr. Anchor. Thus any error would have been harmless in that it could not have affected the judgment or otherwise result in prejudice to the judicial process. Tenn. R.App.P. 36(b); Tenn.R.Crim.P. 52(b).

The judgment of the trial court is affirmed.

DWYER, J., and ANN LACY JOHNS, Special Judge, concur.