IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
SEPTEMBER 1997 SESSION

FILED

June 12, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | No. 03C01-9611-CR-00444 |
| | ) | |
| Appellee | ) | |
| | ) | RHEA COUNTY |
| V. | ) | |
| | ) | HON. J. CURTIS SMITH, |
| CALVIN LEE SNEED, | ) | JUDGE |
| a/k/a MOONEY SNEED | ) | |
| | ) | |
| Appellant. | ) | (First Degree Murder) |
| | ) | |
| | ) | |

For the Appellant:

Philip A. Condra
District Public Defender
204 Betsy Pack Drive
Jasper, TN 37347

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Peter M. Coughlan
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

James Michael Taylor
District Attorney General
265 Third Avenue, Suite 300
Dayton, TN 37321

James W. Pope, III
Assistant District Attorney

OPINION FILED: _____

AFFIRMED

William M. Barker, Judge

**OPINION**

The appellant, Calvin Lee Sneed, appeals as of right from his conviction of first degree murder in the Rhea County Criminal Court. After a jury trial, appellant was convicted of first degree murder and was sentenced to life imprisonment. On appeal, he presents six issues for our review:

> (1) the evidence was insufficient to prove premeditation and deliberation;
>
> (2) the trial court erred in overruling appellant's objection to the introduction of live rounds of ammunition and spent shell casings recovered from his residence;
>
> (3) the trial court erred in excluding testimony pertaining to the victim's conduct and character;
>
> (4) the trial court erred in refusing to instruct the jury on diminished capacity in the manner requested by appellant;
>
> (5) the trial court erred in overruling appellant's motion to suppress his statement given to law enforcement officials; and
>
> (6) appellant was denied a fair trial when the State failed to disclose Brady material prior to trial.

After a thorough review of the record, we find no reversible error and affirm both appellant's conviction and sentence.

**FACTUAL BACKGROUND**

At approximately 10:45 p.m. on the night of March 8, 1994, Marvin Shaver was feeding calves at his farm on Shaver Loop Road near Dayton, Tennessee. He noticed a car turn into the appellant's neighboring driveway, located close to his barn. After he finished his work, Mr. Shaver drove the short distance from the barn to his home. As he exited the vehicle and approached his porch, he heard a gunshot, followed by a pause, and then five or six more shots, fired in rapid succession. The sound of the gunshots came from the direction of his barn and the appellant's residence. Moments later, he heard a "racket" and walked to the road. From there, he could hear the roaring sound of a vehicle engine and he assumed that a vehicle had been driven into

2

a ditch. He also noticed an orange glow around the area and believed the vehicle was on fire. He phoned 911 and informed the dispatcher about the shots and the car.

Mr. Shaver thereafter drove to the scene to meet Leon Sneed,[1] the Sheriff of Rhea County. The men found that a car had gone over a steep embankment and was nose-down in a ditch. The car appeared to have rolled straight down the appellant's sloped driveway and crashed into the ditch. Portions of the car were burning and it was surrounded by a lot of smoke. Mr. Shaver and Sheriff Sneed walked down into the ditch and could see that someone was still inside the car. The driver's side door was jammed against a tree and the men struggled to get inside the car. Finally they were able to open the passenger's side door and pull a woman from the car. Fearing the car would explode, they carried the woman out of the ditch to the pavement above. In the illumination of car headlights, they recognized the woman as Carol Dawson Sneed, the appellant's wife. Emergency personnel arrived, but Mrs. Sneed was already dead. She had died from a gunshot wound to the back of her head.

After discovering the victim, Mr. Shaver and Sheriff Sneed noticed the appellant standing on his front porch about 150 feet away. They could hear him shouting, but were unable to understand what he was saying. Sheriff Sneed approached appellant's residence and saw him holding a pistol. Appellant refused the sheriff's requests to put down the gun, saying instead, "She come up here and started threatening and cussing me and I just come out and opened up on her." He was resistant of Sheriff Sneed and repeatedly said that he would not be taken alive. Although appellant continued to act belligerently, he was finally coaxed into entering his house. Once inside, he tossed some documents onto the kitchen table and urged Sheriff Sneed to read the divorce papers. Appellant stated, "Right here is what the whole damn thing is about and then the bitch comes out here running her mouth."

---

[1]Trial testimony indicated that Sheriff Sneed and the appellant were distant relatives.

A number of other officers arrived on the scene and surrounded appellant's mobile home. Sheriff Sneed eventually convinced appellant to give up his weapon and the other officers rushed into the trailer. Appellant told them, "You might as well go ahead and kill me, I'm not going alive." One officer struck appellant on the chin with the butt of his rifle, knocking him to the ground. A number of live rounds of ammunition scattered onto the kitchen floor from appellant's bulging shirt pockets. Appellant continued to struggle, but was finally subdued and placed under arrest.

Several hours later, appellant gave a statement to Dean Cranfield, an investigator with the Rhea County Sheriff's Department. Appellant told Cranfield that he called the victim about 4:30 p.m. that afternoon at a local bar. He said that the victim was playing a video poker machine and had her fourteen-year-old daughter with her. According to appellant, the victim told him that she had put a lot of money into the poker machine. He said that he called the bar again at 8:30 p.m. and was told that the victim was not there. He then stated that the victim telephoned him three times that evening from two different bars.

Appellant told Cranfield that the victim came to his house around 11:00 p.m. and argued with him about alleged infidelities. The victim searched appellant's mobile home looking for another woman and appellant shot at her before she fled to a neighbor's house. He asserted that he was only aiming at the tires on her car, but missed. He also stated that he knew if he hit the radiator, she could not leave; however, the shots he fired were too high. Finally, appellant told Cranfield that "she needed it" and he emptied the gun that held seventeen shots. He, nevertheless, stated that he loved the victim.

Appellant was indicted for the first degree premeditated murder of Carol Dawson Sneed. There was evidence at trial indicating that the relationship between the two had been stormy and unstable. They were first married in 1991, divorced in early 1992, and then remarried in 1993. The victim had again filed for divorce ten days before her death. Nevertheless, appellant and the victim had attempted to

4

reconcile their differences the prior weekend and had agreed to continue living together.

On the day of the murder, appellant called the victim's mother, Joy Dawson, numerous times looking for the victim. He told her that he had contacted a local bar, but the employee would not let him talk to the victim. Appellant continued to call Mrs. Dawson, looking for the victim, asking her to have the victim call him, and requesting that she send the victim home. During one phone call, the appellant said that if the victim did not come home, he would go after her. During another conversation, he told Mrs. Dawson that if the victim did not come home, he was "going over there and blow everybody away."

The victim arrived at Mrs. Dawson's house around 10:15 p.m., just as the appellant was calling again. The victim and appellant had several brief telephone conversations, during which the victim repeatedly refused to drive to the appellant's home. Finally, however, the victim angrily agreed to the appellant's request. Mrs. Dawson tried to discourage the victim from going because the victim had been drinking and was taking the prescription drug, Valium.

Fifteen minutes after the victim left, appellant called Mrs. Dawson again. This time he said, "I've hit your bitch daughter. When the law comes, they're not going to take me alive." A few minutes later, appellant talked to the victim's daughter and said she needed to come get her mother because "she's laying out here in the ditch."

Several witnesses who were with the victim over the course of the evening testified that she made and received numerous phone calls and that she was worried, upset, and crying. The victim had told her companions that she did not wish to speak to appellant if he called.

Physical proof introduced at trial included photographs of the victim's car. The car was struck by bullets in five separate locations: the vinyl-top roof; the left fender; the taillight; the gas tank; and the license plate, through which a bullet traveled into the interior of the car and lodged in the rear of the driver's seat. The back glass of the car

5

was missing, apparently shattered by the bullet which struck the victim. The medical examiner testified that the victim's blood alcohol content that evening was .15%. He also discovered .4 micrograms of Valium and .3 micrograms of its metabolic product in her bloodstream.

A total of sixteen spent cartridges were retrieved from the appellant's driveway and porch. Numerous other cartridges were in the driveway, but officers seized only those that were least tarnished and appeared "fresh." Sixty-two live rounds were recovered from the appellant's kitchen floor and an additional fifteen rounds were taken from the pocket of a jacket found in appellant's kitchen. Two empty cartridge boxes, which had contained cartridges fitting appellant's gun, were found on the sofa in his living room. They each held a capacity of fifty rounds.

The weapon recovered from the appellant was a Smith and Wesson semi-automatic pistol with a fifteen round magazine. When seized, it contained fifteen live rounds in the magazine and one in the chamber. The live rounds taken from the gun were hollow-point bullets with a protruding lead post. The bullet removed from the seat of the victim's car and the sixteen spent cartridges found in appellant's driveway were identified as having been fired from appellant's weapon. Bullet fragments recovered from the victim's body were too mutilated for comparison or identification.

Several witnesses testified on appellant's behalf. Helen Sneed, the appellant's mother, testified that appellant had been under a doctor's care for several years prior to the incident. She stated that he was taking Valium for his "nerves," and that the victim was not fond of appellant's family. Kathy Smith, appellant's cousin, testified that she and her husband had socialized with appellant and the victim regularly until their relationship became stormy. She and her husband stopped seeing them because they fought so often. Jack Geer, another defense witness, testified that he saw the victim drinking beer in a local bar at 10:30 a.m. on the morning before her death. He stated that she was still there when he left at 2:30 p.m.

Appellant introduced into evidence a copy of a divorce complaint filed by the victim on April 2, 1993. An order dismissing the complaint at the victim's request was entered May 27, 1993. A second divorce complaint, also introduced at trial, was filed by the victim on February 25, 1994. Both complaints alleged cruel and inhuman treatment, improper marital conduct, and irreconcilable differences. The latter complaint was served on appellant four days before the murder.

Mike Owenby, a Sergeant with the Rhea County Sheriff's Department and friend of the appellant, testified that appellant called him on March 8, 1994, between 9:00 and 9:30 p.m. and said that the victim was at a local bar and was intoxicated. Appellant wanted Sergeant Owenby or another officer to check the victim and arrest her for DUI if she were driving.[2] Owenby testified that he was not on duty that night and took no action after talking to the appellant. He also stated that he was aware of the volatile relationship between the victim and the appellant.

Dr. Stewart Bacon, a doctor in family practice in Dayton, testified that appellant had been under his care for thirteen years. Between 1990 and 1992, he diagnosed appellant with acute and chronic anxiety and prescribed tranquilizers to treat that condition. He also had appellant evaluated psychologically and, as a result of that evaluation, prescribed a stronger medication for him. The chief jailer at the Rhea County Sheriff's Department testified that while in jail, the appellant was taking between sixteen and twenty-three pills of prescription drugs per day.

Richard Wagner, an attorney from Chattanooga, also testified on appellant's behalf. He stated that he had represented appellant in civil matters, including the last divorce complaint filed by the victim. He had also represented the victim in certain legal matters while she and appellant were married. In the summer of 1993, appellant contacted Mr. Wagner about an employment discrimination claim. Mr. Wagner agreed to represent him. He testified that the case was stressful for the appellant because he

---

[2]Appellant admitted at trial that he called Sergeant Owenby about the victim, claiming only that he was concerned for her safety.

was very worried that he would lose his job. Mr. Wagner described appellant as "scared to death" and stated that appellant, during that time, was "not the Calvin I'd known before."

Testifying in his own defense, the appellant said that in February and March of 1994, he and the victim were together, but he could not remember if they were married. He testified that the victim would often decide to leave and take all of her belongings from their home. He further indicated that he was having health problems during that time which caused him to miss work. Because of the pending employment discrimination claim and his marital status, appellant stated that he was very sick, nervous, and "tore up" during those months.

Appellant related that on March 4, 1994, the victim called to tell him she had filed for divorce again. After appellant picked up the summons and complaint at the Sheriff's Department, the victim came to his house and informed him that she did not want a divorce and asked that the two of them go away for the weekend. Appellant agreed and they spent the weekend in Dalton, Georgia. During that time, they discussed their problems and defined the limits of their marital roles. One of the major issues was the victim's frequent visits to local bars, which, according to the appellant, the victim agreed to limit. By the time they returned home, they had decided to again live together as husband and wife.

Appellant testified that he had a doctor's appointment in Chattanooga on March 8 and that the victim had agreed to accompany him. However, when he prepared to leave that morning, she declined saying she had other things to do. When he returned that afternoon, he noticed the victim's car in the parking lot of a local tavern. He called the tavern after he arrived home and talked to the victim. He testified that the victim told him she was eating with her daughter and expected to be home around 5:00 or 5:30.

Appellant testified that the victim did not come home at that time. He then detailed a series of telephone calls he made to Mrs. Dawson and local bars that

8

evening trying to get the victim to come home. He denied threatening to "blow everybody away." Although he testified that some of the conversations with the victim were heated, he also stated that during one phone call, the victim was talking cordially. However, from her slurred speech, he could tell that she had been drinking. Appellant stated that he was upset she was not abiding by her promise to limit her bar visits. He later admitted that he had been drinking some that day and was also taking Valium.

The appellant testified that he spoke to the victim at the Dawson residence and she wanted him to pick her up. When he refused, she responded, "That's all right you son-of-a-bitch, . . . I'll be out [t]here in a little while." The victim arrived at his house ten to fifteen minutes later and, according to appellant, threw down her purse and asked if another woman was there. He said that she then searched the mobile home looking for someone else. In turn, he asked her who she had been with that evening. Appellant testified that a very heated argument ensued and many hurtful things were said. Finally, the victim told him she was going to pick up a "real" man and go "partying." Appellant replied, "Not in that car,"[3] and eventually shot at the car as the victim tried to drive away. He denied any intention of hurting the victim, stating that he merely wanted to cause a flat tire.

On cross-examination, appellant remembered that the victim left the mobile home, but then returned for her car keys. He admitted firing a couple of shots while she was getting the keys; however, he tried to keep her from leaving because she was too drunk to drive. He also admitted firing additional shots at the tires as the victim walked toward the car. He could not remember how many shots he fired before he went back inside the house. Thereafter, he heard a roaring noise and saw headlights at the end of the driveway in the ditch.

---

[3]Appellant explained that he had purchased the tires on the car and did not want the victim driving away with them.

Appellant stated that he could not remember reloading the pistol. He also professed that he could not remember exactly where the gun was before the victim arrived, but that it was close by him.[4] He claimed that he had put the two boxes of live rounds on the sofa when he talked to Sergeant Owenby because he wanted to ask Owenby to order new shells for him. Appellant testified that he could not remember several things he said during his conversation with Dean Cranfield, nor did he remember calling Mrs. Dawson after the shooting.

Based upon the foregoing evidence, the jury found appellant guilty of first degree premeditated murder. The trial court sentenced appellant to life imprisonment.

## SUFFICIENCY OF THE EVIDENCE

Appellant first contends that the evidence was insufficient to prove premeditation and deliberation. He argues that the State failed to show that he deliberated over his plan to kill the victim or that he possessed a cool mental state. We disagree and find abundant evidence of both premeditation and deliberation.

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1979).

At the time of this crime, first degree murder was defined as an intentional, premeditated and deliberate killing. Tenn. Code Ann. §39-13-202(a)(1) (Supp. 1994). A "premeditated act" was statutorily defined as "one done after the exercise of reflection and judgment." Tenn. Code Ann. §39-13-201(b)(2) (1991). The statute also

---

[4]Appellant said that he always kept a gun close by him when at home and that he usually put the gun closest to where he would be inside the house.

defined a "deliberate act" as "one performed with cool purpose." Tenn. Code Ann. §39-13-201(b)(1) (1991). Deliberation necessarily implies that the offense must have been committed free of the passions of that moment. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). See also Brown, 836 S.W.2d 530, 541 (Tenn. 1992).

All murder is presumed to be in the second degree and the State bears the burden of proving that the killing was premeditated and deliberate. Brown, 836 S.W.2d at 543. Premeditation and deliberation are factual determinations for the jury and may be inferred from the manner and circumstances of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

The factual record before us provides ample evidence of premeditation. Several hours before the murder, appellant called the victim's mother and threatened to go to the bar where the victim was and "blow everybody away" if the victim did not come home. That threat included the victim and further implied that appellant would use a gun to accomplish the deed. Moreover, appellant procured his pistol and had it nearby well in advance of the victim's arrival. He also prepared the weapon and retrieved boxes of ammunition and placed them on the couch within close proximity of where he was sitting. Appellant went even further by filling his shirt pockets with sixty-two live rounds and placing fifteen live rounds in his jacket pocket, the exact number necessary to refill the magazine in his pistol. That activity was strong evidence of premeditation. Bordis, 905 S.W.2d at 222.

Although the great number of rounds found by the appellant does not by itself establish premeditation, that evidence was relevant for the jury's consideration in conjunction with other evidence. Brown, 836 S.W.2d at 543. Sixteen spent cartridges were recovered from appellant's driveway. At least six bullets struck the car itself. In appellant's statement to law enforcement, he admitted that he "emptied the gun" when he fired at the victim. From those circumstances, the jury could infer the necessary *mens rea.* Bordis, 905 S.W.2d at 222.

11

We also note that appellant shot at the unarmed victim when she was walking away from his house. When the fatal bullet was fired, the victim was literally driving away from appellant's residence. Considering appellant's earlier threat to "blow everybody away," coupled with his preparations, we conclude that a rational jury could find that appellant formed the intent to kill well in advance of the murder. Both the use of a deadly weapon on an unarmed victim and declarations of an intent to kill constitute circumstantial evidence of premeditation and deliberation from which the jury could find the necessary state of mind. See Brown, 836 S.W.2d at 541. See also State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

There was additional evidence that appellant acted deliberately and with a cool purpose. Deliberation includes the process of weighing the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences to be placed upon the killer when apprehended. Brown, 836 S.W.2d at 541. Appellant had ample time to contemplate the murder of the victim. By his own admission, he retrieved the boxes of live cartridges while talking to Sergeant Owenby, which was at least one hour before the victim arrived at his house. Over the course of the evening, appellant tried in vain to reach the victim and to have her come home. As the evening wore on, the appellant had substantial time to weigh the wisdom of his proposed course of action.

Proof at trial also demonstrated that appellant was calm before the murder. Several of appellant's friends testified that they had telephone conversations with him that evening while he was awaiting the victim's arrival. Appellant was not upset or angry during those conversations. In fact, Sergeant Owenby stated that he and appellant had a normal conversation which lasted approximately fifteen to twenty minutes. He also stated that he could not tell that appellant was angry. Another witness who spoke with appellant that evening stated that he did not notice anything out of the ordinary. As a result, it was reasonable for the jury to find that appellant

12

was free of passion and excitement when he contemplated the murder. Brown, 836 S.W.2d at 540.

Appellant's statement to the victim's mother after the killing, that he would not permit the authorities to apprehend him alive, indicates that the he had considered the consequences of killing the victim and made a decision to die rather than be arrested. That is additional evidence of appellant's deliberation. Brown, 836 S.W.2d at 541. Further, the appellant had obviously considered the manner in which the murder would be accomplished by securing his weapon, ensuring it was loaded, and arming himself with excessive amounts of ammunition. Id.

Although there was evidence in the record that appellant and the victim fought immediately prior to the shooting, we do not believe that negated a jury finding of deliberation. This Court has previously held that the presence of agitation, or even anger, does not necessarily preclude a finding of deliberation. State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993). Considering the evidence in this case, the jury was justified in finding that appellant coolly carried out his preconceived plan to kill the victim, irrespective of the emotion associated with the argument.

We also conclude that the jury was entitled to reject the appellant's claims that he was only shooting at the tires on the car. At least six bullets struck the car and none of them were in close proximity to the tires. One bullet struck the roof of the vehicle and another shattered the back glass, leading to the victim's death. That evidence clearly justifies the jury's conclusion that appellant's intentions were other than shooting the tires. The convicting evidence was sufficient.

### ADMISSIBILITY OF LIVE ROUNDS AND SPENT SHELL CASINGS

Appellant next contends that the trial court erred in overruling his objection to the introduction of the ammunition found on the kitchen floor of his residence and the ammunition recovered from his jacket. He argues that the evidence was not relevant and any probative value was outweighed by the danger of unfair prejudice.

13

This issue is without merit.

The trial court held a pretrial hearing on appellant's motion in limine, but declined to rule until the ammunition evidence was offered at trial. Accordingly, appellant renewed his objection to the introduction of the evidence prior to Sheriff Sneed's testimony. The trial court again heard arguments and ruled that the evidence was admissible. Specifically, the trial court found the evidence relevant to the issues of premeditation, deliberation, and intent. It further found that the probative value was not substantially outweighed by the danger of unfair prejudice.

The admissibility of evidence generally is a determination that rests within the sound discretion of the trial court. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). To demonstrate error, the appellant must show an abuse of that discretion. Id.

We agree with the trial court that the ammunition was relevant to prove premeditation and deliberation. The ammunition demonstrated appellant's planning activity and helped to explain the empty boxes of shells found on the sofa in his living room. The trial court properly found that the probative value of the ammunition was not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

Similarly, appellant objected to the introduction of sixteen spent shell casings recovered from his driveway after the murder. He argued that the shell casings should not be admitted where the testimony reflected that a maximum of ten shots was heard. He also argued that the State was unable to prove a "nexus" between those empty casings and the alleged crime. His theory was that the empty shell casings could have been fired at any time prior to the murder. The trial court properly found that appellant's objection went to the weight of the evidence, not to its admissibility. This issue is without merit.

14

## EVIDENCE OF THE VICTIM'S CHARACTER

The appellant next challenges the trial court's ruling to exclude certain testimony which he believes pertained to the victim's character. He contends that the testimony would have shown the aggressive and confrontational character of the victim which was relevant to demonstrate the provocation associated with voluntary manslaughter. In turn, he argues that the evidence would have contradicted premeditation and deliberation.

Appellant sought to offer opinion testimony from a Chattanooga attorney, Richard Wagner, that the victim knew how to provoke the appellant. The trial court held a hearing outside the presence of the jury and received an offer of proof. Mr. Wagner had represented both the appellant and the victim during their marriage on civil matters and had been involved in the 1992 divorce proceedings. He testified that he was "familiar with the problems they were having all along." He further stated:

> It was a firm opinion that I had then and have now, is that she [the victim] knew how to push his button. She knew how to get him angry and how to excite him and how to get him arrested, yes sir. And I have an opinion, as far as Calvin goes, I think he did feel for her, but it was kind of relation that he wanted her company and she wanted his money and when he didn't have any money she didn't need him. When she had money then she didn't need him and if she was unemployed and didn't have anything, that she'd be back with Calvin.

After hearing the offer of proof, the trial court ruled that the testimony was not evidence of a character trait, but rather an opinion as to whom was at fault in the marriage. The trial court excluded the testimony because it was not within the purview of Tennessee Rule of Evidence 404(a)(2). Appellant must show that the trial court abused its discretion in that ruling before this Court may find error. Banks, 564 S.W.2d at 949.

Generally, character evidence is inadmissible to prove action in conformity with character on a particular occasion. Tenn. R. Evid. 404(a). However, there are certain occasions when the character of the accused and the victim of a crime is admissible. Id. In particular, Tennessee Rule of Evidence 404(a)(2) allows:

15

Evidence of a pertinent character trait of the victim of a crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

Because the appellant did not pursue a theory that the victim was the first aggressor, our focus is on the first portion of that rule.

To determine whether Rule 404(a)(2) controls, we must first decide whether the proffered testimony was evidence of the victim's character. Although Tennessee authority on what constitutes character is sparse, one respected authority describes it as "a generalized description of a person's disposition in respect to a general trait, such as honesty, temperance or peacefulness." Neil P. Cohen et al, Tennessee Law of Evidence §404.1 at 162 (3d. ed. 1995) (quoting McCormick on Evidence 574 (E. Cleary 3d ed. 1984)). Character has also been defined as "the aggregate of the moral qualities which belong to and distinguish an individual person." Black's Law Dictionary 232 (6th ed. 1990).

Using those definitions as guidance, we conclude that portions of the proffered testimony fell within the realm of character evidence. Testimony that the victim "knew how to push his [appellant's] button" was relevant to demonstrate the manipulative and confrontational character of the victim. Moreover, we conclude that the character trait at issue was pertinent to appellant's theory that the killing was committed in the heat of passion. The appellant sought to prove that the victim acted in a manner to sufficiently provoke the shooting.

In reaching the foregoing determination, we are mindful that appellant's defense theory was substantiated by more than just argument of counsel. Ruane, 912 S.W.2d at 781 (requiring issue of first aggressor be raised by the evidence, not just arguments of counsel). There was ample proof that the victim and appellant had argued throughout the evening preceding the murder. Fifteen minutes prior to her death, the victim had several brief, but heated telephone conversations with the appellant. Defense counsel elicited testimony from Sheriff Sneed that appellant was

"irrational"[5] when he arrived on the scene. Appellant buttressed his theory by testifying that he and the victim were arguing vehemently before he fired the shots. Specifically, appellant testified that the victim stated she was "going to get her a real man" and "go partying." The question of whether those arguments and statements were adequate provocation to create a state of passion and lead a reasonable person to act in an irrational manner was a factual determination for the jury. However, the appellant was entitled to submit relevant proof on the issue.[6]

Nevertheless, we are unable to conclude that the exclusion of Mr. Wagner's statement rises to the level of reversible error. Both the prosecution and defense presented significant evidence of the volatile relationship between the victim and appellant. The jury was aware that the parties had been married, divorced, remarried, and that the victim had filed for divorce on two additional occasions, alleging cruel and inhuman treatment. A relative of the appellant testified that she did not associate with the couple because they fought so often. Mrs. Dawson testified that the victim and appellant had been arguing that evening and that appellant was upset with the victim because she was not at home. Appellant's testimony also provided abundant proof regarding the unstable dynamics of his marriage to the victim. Considering the record as a whole, we are certain that any error in excluding Mr. Wagner's testimony respecting the victim's character was harmless beyond a reasonable doubt. Tenn. R. Crim. P. 52(a).

---

[5] That the person charged acted in "an irrational manner" is an element of the offense of voluntary manslaughter. Tenn. Code Ann. §39-13-211 (1991).

[6] Even if we were to agree with the trial court that Mr. Wagner's testimony was not character evidence, it remains that the proof should have been admitted. Outside the realm of character evidence, the testimony was subject to the normal tests of relevance and unfair prejudice to the appellant. See Tenn. R. Evid. 401, 403. As discussed above, the evidence was relevant to corroborate one aspect of the appellant's defense. Therefore, unless the probative value was substantially outweighed by the danger of unfair prejudice, the evidence was admissible. Tenn. R. Evid. 403. The testimony would not have been unfairly prejudicial to the prosecution because of the substantial testimony previously offered about the nature of the relationship between appellant and the victim. Regardless of whether we characterize the testimony as evidence of character, it was certainly relevant and admissible.

## JURY INSTRUCTION ON DIMINISHED CAPACITY

The appellant next challenges the jury instruction on diminished capacity. He argues that the trial court's charge was erroneous because it failed to instruct the jury that diminished capacity applied to premeditation and deliberation. Although we conclude that a diminished capacity instruction was not warranted under the facts, we find no error in the instruction given by the trial court.

In Tennessee, the doctrine commonly referred to as "diminished capacity" was first recognized by this Court in 1994. State v. Phipps, 883 S.W.2d 138,149 (Tenn. Crim. App. 1994). After an exhaustive review of authority from sister states and the federal circuits, this Court held that "evidence, including expert testimony, on an accused's mental state, is admissible in Tennessee to negate the elements of specific intent, including premeditation and deliberation in a first degree murder case." Id. The supreme court summarily agreed with Phipps in State v. Abrams, 935 S.W.2d 399, 402 (Tenn. 1996).[7] However, the court did not specifically address the doctrine of diminished capacity until State v. Hall, 958 S.W.2d 679 (Tenn. 1997).

In Hall, the high court reviewed the exclusion of expert testimony which the appellant alleged was relevant to negate the essential elements of premeditation and deliberation. Id. at 688-692. Similar to the discussion in Phipps, the Hall court held that evidence of diminished capacity is not admissible to justify or excuse a crime, but instead to prove that a defendant was incapable of forming the requisite mental state, thereby resulting in a conviction of a lesser offense. See id. at 692. The court cautioned against referring to such testimony as proof of "diminished capacity." Id. at 690. Instead such evidence should be presented to the trial court to negate the existence of the *mens rea* for the charged offense. Id. Against this backdrop, we must evaluate the jury instruction given at appellant's trial.

---

[7]Following Phipps, the supreme court stated that "evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense." Abrams, 935 S.W.2d at 402. The court commented that further development of the rule of diminished capacity would be deferred to "another day." Id.

The appellant requested a jury instruction based upon the charge quoted in footnote ten of <u>Phipps</u>. 883 S.W.2d at 143. Appellant's proposed charge read as follows:

> The jury is further instructed that the Defendant has submitted evidence that the Defendant was suffering from a mental disorder known as acute and chronic anxiety. This evidence should be considered by you, specifically in reference to whether or not the Defendant possessed the necessary premeditation or deliberation for him to be convicted of murder in the first degree.
>
> The jury is further instructed that you should consider this condition and the expert testimony thereto in relation to the crimes of second degree murder and voluntary manslaughter as it relates to whether or not the mental disorder of the Defendant further obscured his reasoning at the time of the offense and also affected his ability to be reasonably and adequately provoked.
>
> While this evidence may not establish a defense wherein the Defendant would be found not guilty of any offense, it may be considered by you in deliberating upon the necessary elements of murder in the first degree, murder in the second degree, voluntary manslaughter, and reckless homicide in that each of these offenses requires that the Defendant act intentionally or knowingly or evidence a conscious disregard.
>
> Should you find that the necessary elements of any of these grades of homicide are not present, the Defendant must be acquitted as to that charge.

After an extensive discussion with both the State and appellant's counsel, the trial court modified the proposed charge to read as follows:

> The Defendant has submitted evidence that he suffered from a mental disorder known as acute and chronic anxiety. You must consider what affect [sic], if any, this condition had on the Defendant's ability to form the required mental states necessary for him to be convicted of the indicted offense and any lesser included offense.
>
> While this evidence may not establish a defense resulting in Defendant being found not guilty of any offense, it may be considered by you in deliberating upon the essential elements of the indicted offense and lesser included offenses.
>
> Should you find that the necessary elements of either the indicted offense or any lesser included offenses are not present, or if you have a reasonable doubt as to whether the necessary elements are present, you must find the Defendant not guilty of that charge. You may consider evidence of this condition, along with other relevant evidence in arriving at your verdict.

19

While the proposed charge and the one given by the trial court differ somewhat, we conclude that the overall import of diminished capacity was given to the jury.

The jury instruction found in Phipps was not intended by this Court to be the only charge on diminished capacity. While the quoted instruction in Phipps is correct, trial courts need not follow it word for word.[8] Nevertheless, as in this case, trial courts may rely on that instruction when charging the jury on diminished capacity.

We find no error in the instruction given by the trial court. It provided that "you must consider what affect, if any, this condition had on the Defendant's ability to form the required mental states necessary for him to be convicted of the indicted offense and any lesser included offense."[9] That language conforms to the supreme court's holding that evidence of diminished capacity is "relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." Hall, 958 S.W.2d at 690; State v. Kelley, 868 S.W.2d 733, 736 (Tenn. Crim. App. 1993). Appellant's issue is without merit.

### SUPPRESSION OF APPELLANT'S PRE-TRIAL STATEMENT

The appellant next challenges the trial court's denial of his motion to suppress. His argument is two-fold: (1) his statement was not given freely, voluntarily, or knowingly; and (2) the written statement did not include significant information that he conveyed to the officer and is therefore misleading.

Deputy Dean Cranfield of the Rhea County Sheriff's Department testified at the hearing on appellant's motion to suppress. He stated that he took a statement from

---

[8]We note that the Tennessee Pattern Jury Instructions do not include a charge on diminished capacity.

[9]The trial court's charge on diminished capacity did not limit its application to the crime of first degree murder, but charged that it was applicable to the mental states necessary for lesser included offenses. Although not explicitly addressed, the Hall opinion apparently did not limit application of the doctrine to specific intent crimes, as this Court implied in Phipps, 883 S.W.2d at 149 n.19 (declining to decide whether diminished capacity negates mental states other than specific intent). We believe this is implicit in the court's repeated statements that diminished capacity is relevant to negate the *requisite culpable mental state*, not just premeditation and deliberation. Hall, 958 S.W.2d at 690 (emphasis added). Moreover, the distinction between general and specific intent crimes has been abandoned in our criminal code. Tenn. Code Ann. §39-11-301 (Sentencing Commission Comments). Nevertheless, even if that portion of the instruction is considered error, it was harmless.

20

the appellant at the jail at approximately 4:00 a.m. on March 9, 1994. He read the *Miranda* rights to the appellant and appellant acknowledged that he understood his rights. When given the waiver of rights form, appellant placed an "X" to signify his waiver of those rights. Deputy Cranfield testified that appellant gave his statement in narrative form and would stop and ask Deputy Cranfield if he could look at what the deputy was writing down. On one occasion, the appellant asked him to make a change, which he did. When appellant requested an attorney, Deputy Cranfield stopped the interview. Appellant grew quiet for "just a minute" and then began talking again.

On cross-examination, Deputy Cranfield admitted that his written notes, constituting appellant's statement, did not reflect everything that the appellant said. Deputy Cranfield testified that he wrote down what he thought was important and chose not to use available tape recording devices. In addition, he stated that he did not insist that appellant sign his name on the waiver form and that appellant refused to sign the written statement.

The trial court did not formally overrule the motion to suppress on the record. Before appellant's statement was introduced at trial, however, the trial court commented that it had earlier overruled appellant's motion off the record and cited a case upon which it relied.[10] The statement was then read to the jury.

The factual findings made by the trial court after a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Conversely, the ultimate determination of admissibility is a question of law to be reviewed *de novo*. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Although we do not have explicit findings of fact, the trial court's decision to deny the

---

[10]The trial court relied upon State v. Green, 613 S.W.2d 229 (Tenn. Crim. App. 1980), which pertains to the admissibility of a statement made when the accused was under the influence of alcohol, narcotics, or was insane. That authority relates to appellant's argument before the trial court that he suffered a head injury during his arrest which affected his mental faculties and affected his ability to make a knowing waiver. Appellant has not pursued that argument on appeal and the case is inapplicable to his remaining arguments.

21

motion indicates a determination that the appellant did voluntarily and knowingly waive his right against self-incrimination. See State v. House, 592 S.W.2d 902, 904 (Tenn. Crim. App. 1979). Moreover, there is no factual dispute about the circumstances surrounding the taking of appellant's statement.[11] In appellant's brief and argument, he addresses only the legal conclusions which are within the parameters of appellant review.

A defendant's Fifth Amendment right against self-incrimination may be waived only if done so voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Similarly, Article I, Section 9 of the Tennessee Constitution requires a voluntary and knowing waiver, although it affords greater protection in certain scenarios. See State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992) (setting forth stricter standards for determining voluntariness of a confession made subsequent to an illegally-obtained initial confession).

In order for an accused to effect a waiver, he must be adequately apprised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). To determine whether a confession was made voluntarily and knowingly, the totality of the circumstances must show an uncoerced choice and the required level of comprehension. Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn. 1980). Considering the circumstances in appellant's case, we affirm the trial court's ruling that the statement was admissible.

Appellant does not deny that he was fully informed of his rights and that he acknowledged understanding of those rights. He signed the waiver of rights form by making an "X" on the signature line. Without prompting by Deputy Cranfield, appellant freely conveyed his version of the events. When appellant requested an attorney, the

---

[11]The appellant did not testify at the suppression hearing. Deputy Cranfield provided the only information about appellant's statement.

questioning ceased; however, appellant spontaneously reopened the conversation.[12]

Deputy Cranfield stated that he did not threaten appellant or make any promises to him. The record contains no evidence to the contrary and we conclude that the waiver was knowing and voluntary.

Appellant, however, argues that the marking of an "X" on the waiver of rights form, when he was capable of signing his name, is "strong evidence that he did not waive his constitutional rights." Appellant cites no authority for such a conclusion and we respectfully disagree with his contention. Although an express written or oral statement of waiver of the right to remain silent is strong proof of the validity of the waiver, it is not necessary. North Carolina v. Butler, 441 U.S. 370, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

Tennessee law recognizes that the lack of an explicit written waiver after Miranda warnings are given does not *per se* require exclusion of a confession, if waiver can be found from the facts and surrounding circumstances. State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986); State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980), cert. denied 454 U.S. 1096, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); House, 579 S.W.2d at 904 (citations omitted). Because we are required to address the totality of the circumstances, we believe the marking on the waiver of rights form is but one factor to consider. In our view, the "X" served as a sufficient acknowledgment, even though it was not appellant's signature. The argument is without merit.

Similarly unpersuasive is appellant's argument that the statement should have been suppressed because it did not contain every statement given to Deputy Cranfield. The fact that a law enforcement official does not record everything the accused told him does not lead to the suppression of the otherwise admissible

---

[12]There is no constitutional violation where questioning ceases in light of an accused's request for an attorney, but the accused subsequently initiates conversation with law enforcement. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

confession. State v. Caldwell, 696 S.W.2d 541, 542 (Tenn. Crim. App. 1985). However, the accused is entitled to submit evidence of all that he said to officials, including any exculpatory or self-serving declarations. Id.

In this regard, we note that Deputy Cranfield was cross-examined extensively about other statements made by the appellant. Deputy Cranfield candidly admitted before the jury that the written statement did not contain everything the appellant said. Defense counsel further questioned Deputy Cranfield about certain statements that the appellant alleged he made. Therefore, in accordance with Caldwell, the appellant was given the opportunity to present his additional statements to the jury. Appellant is entitled to no relief on this issue.

## FAILURE TO DISCLOSE BRADY MATERIAL

Appellant next contends that the prosecution suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He argues that a report prepared by Sheriff Sneed contains exculpatory information and should have been disclosed to him before trial. In addition, he argues that a letter written by the victim's mother was relevant for impeachment and should have been disclosed before trial.[13]

In order to substantiate a due process violation under Brady, an appellant must demonstrate that: (1) the State suppressed the information; (2) the information was favorable to the accused; and (3) the information was material.[14] State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (citations omitted). See also State v. Philpott, 882 S.W.2d 394, 402 (Tenn. Crim. App. 1994) and State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992). The burden of showing this constitutional violation falls on

---

[13]Our review on this issue is somewhat hindered because neither Sheriff Sneed's report nor the letter prepared by the victim's mother are included in the record.

[14]An additional requirement, that the defendant request the information, was also discussed by our supreme court. Edgin, 902 S.W.2d at 389. Although we note that the appellant made a request, the United States Supreme Court has held that the test for materiality applies irrespective of such a request. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

24

the appellant and requires a showing that the omission is so significant as to deny the defendant the right to a fair trial. Edgin, 902 S.W.2d at 389 (citations omitted).

Sheriff Sneed prepared a report at 3:32 a.m. on March 9, 1994, after appellant was arrested. At trial, the State provided appellant's counsel with a copy of that report only after the Sheriff testified on direct examination. At issue, according to the appellant, is information in the report that he was "suicidal," "real mad," and "overly mad over a situation." We agree that those statements were favorable to appellant's theory that he committed the crime in a state of passion. A portion of appellant's defense was devoted to showing that he acted in a state of passion, consistent with the lesser offense of voluntary manslaughter. Tenn. Code Ann. §39-13-211 (1991).

In addition, appellant argues that other statements in the report were favorable to his defense as being contradictory to the Sheriff's testimony and other proof at trial. While we recognize that evidence impeaching the Sheriff's credibility may have been exculpatory within the meaning of Brady, appellant was not deprived of an impeachment opportunity. Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995) (citations omitted). Having received and reviewed the report prior to cross-examination, appellant's counsel was able to question Sheriff Sneed about any inconsistencies.

Furthermore, although the report contained exculpatory information, it certainly was not material within the meaning of Brady. To constitute material evidence, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (quoting Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). We are unable to say that the suppression of the report until after direct examination undermines confidence in the outcome of appellant's trial. Id. Our conclusion is strengthened by the fact that defense counsel used the report to impeach the Sheriff's testimony and to present arguments before the jury. See Philpott, 882 S.W.2d at 402.

Additionally, appellant contends that the report was subject to his motion for discovery under Tennessee Rule of Criminal Procedure 16 because it contained his oral statements. Under Rule 16, a defendant is entitled to discover "the substance of any oral statement which the state intends to offer in evidence at the trial made by the defendant whether before or after arrest *in response to interrogations* by any person then known to the defendant to be a law-enforcement officer." Tenn. R. Crim. P. 16(a)(1)(A) (emphasis added).

Our review of the record indicates that when appellant made those statements to Sheriff Sneed, he was not being interrogated. At that time, appellant was armed and holding a weapon on the Sheriff. Any comments that he made during the time officers were trying to subdue and disarm him cannot be logically considered "in response to interrogation." Outside of Rule 16, reports or memoranda of law enforcement officials are not generally discoverable. Tenn. R. Crim. P. 16(a)(2). Accordingly, the report was not subject to discovery prior to trial under the procedural rules.

Appellant also argues that the written account of events prepared in a letter by the victim's mother, Joy Dawson, was non-disclosed Brady material. As above, defense counsel was not provided with the letter until after the direct examination of Mrs. Dawson. However, counsel was given an opportunity to cross-examine Mrs. Dawson about any inconsistencies in the letter. In appellant's brief, counsel admits that he thoroughly cross-examined the witness, saying he "went line by line through this letter trying to establish the omissions and contradictions." Any prejudice appellant may have suffered from the late disclosure was certainly diminished in that regard. Neither can we say that in the overall scheme of the trial, the letter was material. There is no showing that the result of the trial would have been different had the letter been disclosed pretrial. Edgin, 902 S.W.2d at 389. Appellant is entitled to no relief.

## CONCLUSION

Our review of the record reveals no reversible error committed by the trial court.

Accordingly, we affirm the appellant's conviction and sentence of life imprisonment.

 

_____
William M. Barker, Judge

 

_____
John H. Peay, Judge

 

_____
David G. Hayes, Judge